IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELANIE E. DAMIAN, as Special Monitor and Equity Receiver for the Estate of Hunter Wise Commodities, LLC, et al., <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY CAREY and WINSTON & STRAWN LLP, <br><br> Defendants. | No. 15 C 4335 <br><br> Judge Jorge L. Alonso |

## **MEMORANDUM OPINION AND ORDER**

Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the motion is denied.

### BACKGROUND

This action relates to an action that was pending in the United States District Court for the Southern District of Florida ("Florida Action") in which the plaintiff, the United States Commodity Futures Trading Commission ("CFTC"), sued Hunter Wise Commodities, LLC and its related entities ("Hunter Wise") and several other entities and individual defendants for violations of CFTC regulations and the Commodity Exchange Act (the "Act"), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). In pertinent part, the CFTC alleged that Hunter Wise and its principals, Harold Edward Martin Jr. and Fred Jager (the "Hunter Wise defendants"), led a commodities scheme that involved misrepresenting the nature of precious-metals transactions with retail customers and resulted in those customers losing over $52 million. In February 2014, the Florida court, Judge Donald M. Middlebrooks,

granted summary judgment in favor of the CFTC and against the Hunter Wise defendants on the CFTC's claims that the defendants had violated Section 4(a) of the Act through illegal, off-exchange transactions and Section 4(d) of the Act for failure to register with the CFTC. The Florida court then held a bench trial on the CFTC's claim that the defendants had violated Section 4(b) of the Act by "cheating, defrauding, or attempting to cheat or defraud retail customers in connection with retail commodities transactions"; Section 6(c)(1) of the Act and a CFTC regulation by "employing a scheme or artifice to defraud in connection with contracts of sale of commodities"; and Section 13(a) of the Act by aiding and abetting those violations. *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1324 (S.D. Fla. 2014).[1] The court found that the CFTC had met its burden of proof on each claim, and judgment was entered in favor of the CFTC and against the Hunter Wise defendants. *Id.* at 1346, 1348, 1350-51, 1353. The court also imposed a civil monetary penalty against Hunter Wise in the amount of $55,445,892.39 and held Martin and Jager jointly and severally liable for that penalty. *Id.* at 1353.

The Florida court appointed Melanie E. Damian to serve as Special Monitor and Corporate Manager for Hunter Wise and granted her full authority to act as an equity receiver, with the power to initiate any actions necessary to preserve or increase the assets of the receivership estate. (12-CV-81311-DMM (S.D. Fla.), ECF Nos. 77, 78, 306.) On May 15, 2015,

---

[1] On a motion to dismiss, a court may consider the allegations of the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice, such as public records, without converting the motion into a motion for summary judgment. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639-40 (7th Cir. 2008). The parties agree that on the instant motion, this Court can consider the Florida court's opinion as a public record subject to judicial notice. (ECF No. 26, Defs.' Mem. Supp. Mot. Dismiss Compl. at 3-4 n.2; ECF No. 36, Pl.'s Resp. at 8 n.4.)

Damian filed the instant action against Timothy Carey and Winston & Strawn LLP ("Winston"). The three-count complaint alleges that from approximately May 2011 to the present, Carey was a partner at Winston and provided Hunter Wise with legal services in connection with, among other issues, the implications of Dodd-Frank on their business as well as the CFTC investigation. (ECF No. 1, Compl. ¶¶ 7-9.) Damian alleges in Counts I and II that the defendants committed legal malpractice in their representation of, and breached their fiduciary duties to, Hunter Wise. (*Id.* at 14-16.) In Count III, Damian alleges that Winston breached its Retainer Agreement with Hunter Wise by "failing to provide legal services according to the duty of care" that is "[i]mplicit" in that contract. (*Id.* at 16-17.)

Defendants move to dismiss the complaint.

## DISCUSSION

Defendants' motion is based on two grounds: 1) "the [Florida court's] detailed findings in [*Hunter Wise*] directly contradict the allegations in the Complaint and are controlling here"; and 2) "collateral estoppel precludes relitigation of the issue presented in this case which was already decided in [*Hunter Wise*]." (Defs.' Mem. Supp. Mot. Dismiss Compl. at 2.)

Defendants also contend that Counts II and III are duplicative of Count I. (*Id.* at 14-15.) In her response, Damian agrees that Count II is duplicative of Count I and stipulates to its dismissal. (Pl.'s Resp. at 15.) Therefore, Count II is dismissed with prejudice. Damian also indicates that she wishes to amend the complaint to clarify that Count III stems "from the payment of fees to the Defendants" and is pleaded in the alternative to Count I. Defendants stipulate that Count III is pleaded in the alternative and argue that any need for amendment is thus obviated. (ECF No. 37, Defs.' Reply at 11 n.6.) Rather than requiring plaintiff to file an amended complaint, the Court will consider the complaint to be so amended.

A.      **Legal Standards**

On a Rule 12(b)(6) motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts as true all well-pleaded facts in the complaint, and draws all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

B.      **Has Plaintiff Pleaded Herself out of Court?**

Defendants assert that plaintiff has pleaded herself out of court because her allegations are "expressly negated by" the Florida court's findings in *Hunter Wise*. (Defs.' Mem. Supp. Mot. Dismiss Compl. at 3.) According to defendants, those findings "directly contradict" plaintiff's allegations that defendants breached their professional duties and thereby proximately caused injury to Hunter Wise. (*Id.* at 7-10.) In support of their argument, defendants rely principally on *In re Wade*, 969 F.2d 241, 249 (7th Cir. 1992), in which the Court of Appeals stated that a "plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." In *Wade*, the plaintiff had attached to the amended complaint a letter from general counsel for the Executive Office of the United States Trustee that directly contradicted certain allegations in the complaint, so dismissal was found to be appropriate. *Id.* at 244, 249.

The Court of Appeals later characterized *Wade* and similar cases as standing for the proposition that "documents written by a defendant and incorporated into the pleadings by a plaintiff trump allegations in the complaint." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998). In *Northern Indiana Gun*, the Court of Appeals explained that the district court had applied this general rule too broadly to imply that statements in exhibits attached to a complaint should *always* control over allegations made in the complaint. *Id.*

In this Court's view, the reasoning of *Wade* and its progeny does not apply here because the Florida court's opinion is a not a writing that the defendants prepared. Instead, defendants are relying on a court order that they contend contradicts the plaintiff's allegations. This is a thinly-disguised attempt to use collateral estoppel without demonstrating all of its elements.

C.     **Is this Action Barred by Collateral Estoppel?**

Defendants also present a collateral-estoppel argument. Collateral estoppel, also known as issue preclusion, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (internal quotation marks and citation omitted); *see also Specialized Seating, Inc. v. Greenwich Indus., L.P.*, 616 F.3d 722, 728 (7th Cir. 2010) ("issue preclusion (collateral estoppel) applies only to issues actually and necessarily resolved in the first case") (emphasis omitted). "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor*, 553 U.S. at 891. The party seeking to invoke issue preclusion must establish four elements: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to

the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *H-D Mich., Inc. v. Top Quality Serv.*, Inc., 496 F.3d 755, 760 (7th Cir. 2007) (internal quotation marks and citation omitted).

A plaintiff asserting a legal malpractice claim based on Illinois law (which both plaintiff and defendants cite) must prove: "'(1) the defendant attorney owed the plaintiff client a duty of due care arising from an attorney-client relationship, (2) the attorney breached that duty, (3) the client suffered an injury in the form of actual damages, and (4) the actual damages resulted as a proximate cause of the breach.'" *Bourke v. Conger*, 639 F.3d 344, 347 (7th Cir. 2011) (quoting *Fox v. Seiden*, 887 N.E.2d 736, 742 (Ill. App. Ct. 2008)).

The Court's analysis of collateral estoppel requires some background explanation of the facts underlying *Hunter Wise*, taken from the Florida court's opinion:

> Mr. Jager and Mr. Martin's "casino" [Hunter Wise] was a well-planned and executed scheme dealing with financed, off-exchange commodities transactions that they orchestrated using retail customers, the Dealer Defendants, non-party dealers, and metals Suppliers. Hunter Wise's business model revolved around the supposed buying and selling of precious metals, including gold, silver, platinum, palladium, and copper. Hunter Wise claimed to purchase and sell these precious metals from several Suppliers.
> . . . Mr. Martin and Mr. Jager are the sole members and managers of Hunter Wise Services, LLC and are the Chief Operating Officer and Chief Executive Officer of Hunter Wise Services, respectively.
> . . . .
> Hunter Wise's scheme was a multi-level model. First, the Dealer Defendants would contact and solicit novice and amateur investors to enter into financed commodities transactions using Hunter Wise's documents and training material to guide them. Next, the dealers would send the retail customers' funds to Hunter Wise, who would in turn distribute the dealers' applicable share of the fees and interest. Lastly, Hunter Wise would use the remaining funds to enter into margin trading transactions with the metals Suppliers. Hunter Wise steered and controlled every aspect of this process.
> . . . [T]he retail customers[] thought they were purchasing precious metals from the Dealer Defendants on a financed basis. For example, the Dealer Defendants' websites claimed that retail customers would be buying metals, but

> that the metals would be stored in a depository, which would require a storage fee.
>
> . . . .
>
> . . . [T]he retail customers were led to believe that the interest they were paying was for the loans their dealers financed for these transactions and that metals stored on behalf of the retail customers actually existed.
>
> As part of the scheme, Hunter Wise created templates and issued documents on the Dealer Defendants' behalf through its online database called the "portal." . . . All of these documents contained misleading statements or deceptive omissions regarding whether the retail customers actually owned precious metals.
>
> . . . .
>
> While Hunter Wise was directing its brokers and dealers to cheat the retail customers, it was also using the retail customers' funds to execute another level of its scheme. Instead of buying precious metals on a financed basis in the retail customers' name, as they were told and as they agreed to, Hunter Wise took the customers' money, provided the Dealer Defendants with their share, and bought their own precious metals on a financed basis from the Suppliers. These margined trading transactions allowed Hunter Wise to offset its risk and use its downstream clients' money to do so. The agreements Hunter Wise entered into with the Suppliers and their representatives made it clear that Hunter Wise did not in fact own the metals in these margin trading accounts. Delivery of the metals on the retail customers' behalf, whether deferred or not, did not occur.
>
> . . . .
>
> It seems that patrons of Las Vegas casinos would fare better than the retail customers who were caught up in Hunter Wise's scheme. While Hunter Wise was celebrating its gains, over 90% of the retail customers in the scheme lost money between July 16, 2011 and February 25, 2013.
>
> Hunter Wise, Lloyds, and the Dealer Defendants neither purchased precious metals on the retail customers' behalf, disbursed loan funds to finance the portion of the purchase price remaining, nor delivered metals to the retail customers. Yet, the retail customers paid fees and interest on the mistaken belief that the Defendants had done all these things for the retail customers' benefit.
>
> . . . .
>
> As Dodd-Frank neared implementation [on July 16, 2011], Hunter Wise sought ways of continuing to defraud retail customers even though Hunter Wise's illegal operations would soon be under the CFTC's jurisdiction. Hunter Wise hired several attorneys to advise it on its scheme and on the implications of Dodd–Frank. During the relevant period, Hunter Wise's former counsel included John Giovannone ("Giovannone") formerly of Greenberg Traurig; Timothy Carey ("Carey") of Winston and Strawn, and formerly of Dewey & LeBoeuf; and Jay Bruce Grossman ("Grossman") of J.B. Grossman PA or the former firm Grossman Greenberg. Prior to and after Dodd-Frank became effective, Hunter Wise's counsel explained to Mr. Jager and Mr. Martin the serious legal issues associated with Hunter Wise's operations. While Mr. Giovannone was more adamant about Hunter Wise, Mr. Jager, and Mr. Martin's civil and criminal

> liability, Mr. Carey, and even Mr. Grossman, indicated that Hunter Wise documents and actions would violate Dodd-Frank.

21 F. Supp. 3d at 1322, 1325-28, 1330 (footnotes omitted).

Giovannone was on one end of the spectrum of legal advice. He gave Martin and Jager "strong warnings regarding Dodd-Frank's impact on Hunter Wise," making the "unequivocal" recommendation that Hunter Wise either "shut down or change its operations by July 15, 2011, if not before, in order to avoid liability" and warning Martin that if Hunter Wise did not do so, he could "personally be guilty of a felony!" *Id.* at 1330-32. Grossman, on the other hand, was "more akin to an active participant in the fraud rather than disinterested counsel." *Id.* at 1333 n.24. He knew that Hunter Wise did not actually hold the physical metals yet had made, and continued to make, statements to the contrary. *Id.* The Florida court stated that Grossman's "conduct in this matter merits scrutiny by the Florida Bar and regulatory authority." *Id.*

According to the Florida court, Carey seemed to fall somewhere in between:

> Mr. Carey testified that towards the beginning of his representation, which began in May 2011, he informed Mr. Martin and Mr. Jager that Hunter Wise's agreements with the dealers were troublesome and inconsistent with Hunter Wise's actual practices. The agreements, which included the trading agreements, the loan agreements, and administrative service agreements, did not describe accurately the way Hunter Wise transacted its business, but Hunter Wise nevertheless continued to use them and share them with the dealers, who, in turn, provided them to the retail customers.
> Mr. Carey advised Mr. Martin that he did not understand why Mr. Martin believed Hunter Wise had stored metals with each of the Suppliers "given what seemed to be the book entry obligations as opposed to something he could hold in his hand." In an e-mail to Mr. Jager, on August 3, 2011, Mr. Carey advised him about a discussion Mr. Carey had had with Mr. Martin and noted that "getting the notes from the Suppliers from whom Mr. Jager purchased that there was metal behind their sales" would confirm that they actually had metal stored for Hunter Wise's retail customers.
> Instead of obtaining "notes" as Mr. Carey advised, Mr. Martin and Mr. Jager had [the Delaware Depository Services Company, or DDSC] issue Position Reconciliation forms to retail customers that only "confirmed . . . that the products existed and that on the books of your Collateral Manager, Hunter Wise

> Services, LLC, your client, [sic] is identified as the beneficial owner of that collateral." The DDSC's Position Reconciliation forms troubled Mr. Carey. He advised, "it would be a good idea that if you're going to confirm that some amount of physical metal occurs that someone is doing more than writing that on a piece of paper and has some basis on which to make the statement." Mr. Carey questioned the Position Reconciliation notice's language and Mr. Jager and Mr. Martin's decision to have DDSC issue them in light of the fact that neither DDSC, nor anyone else for that matter, had verified the existence of the metals.
> . . . .
> Ultimately, Mr. Martin and Mr. Jager chose to ignore Mr. Giovannone's warnings, as well as Mr. Carey and Mr. Grossmans' advice regarding Dodd-Frank's requirements and Hunter Wise's misleading statements and deceptive omissions. Hunter Wise continued operating after July 16, 2011.

*Id.* at 1332-33 (citations and some brackets omitted).

In an attempt to defeat the scienter element of the fraud claim, Martin and Jager asserted that they had reasonably relied on counsel's advice that "Hunter Wise owned and possessed metals and that the transactions it engaged in did not violate the Act." *Id.* at 1341. The Florida court rejected this defense as "disingenuous." *Id.* With respect to Carey's advice, the court further stated:

> Mr. Carey wrote a legal memorandum that he sent to Mr. Jager and Mr. Martin on August 11, 2011 in regards to Dodd-Frank enforcement. Mr. Carey premised his analysis on certain material assumptions that were incorrect and that greatly influenced his finding that the Act did not apply to Hunter Wise. For example, the memorandum "anticipates," without investigating, that all of the dealers Hunter Wise dealt with were "eligible contract participants" and, therefore, not retail customers. He was not aware that only after Hunter Wise received the retail customers' funds did Hunter Wise generate an account for the retail customers and sent back the dealers' cut of the funds. Further, Mr. Carey assumed that "Hunter Wise's contracts were not executed on a leveraged or margined basis." Since Hunter Wise did interact with retail customers through the portal website and the dealers depended on Hunter Wise for financial aid and services, Hunter Wise knew Mr. Carey's assumptions were inaccurate.
> . . . .
> Hunter Wise's counsel made Mr. Martin and Mr. Jager aware of the legality issues the precious metals transactions and language in Hunter Wise's documents presented. They were on notice of the deception, yet they decided to risk it, laughed about having "adjoining cells," and continued to mislead and deceive customers. There was no metal "at the end of the rainbow"—only offsetting

>transactions. Rather than rely upon the advice of counsel, Mr. Jager and Mr. Martin ignored it.

*Id.* at 1342-43 (citations and brackets omitted).

Defendants contend that the Florida court "found that Hunter Wise's damages were caused by its own intentional fraud committed in spite of Mr. Carey's advice." (Defs.' Reply at 2.) This argument goes too far. It is true that the Florida court found that Martin and Jager had not reasonably relied upon Carey's advice because they had ignored his warnings about the false documentation of Hunter Wise's practices and they knew that the assumptions underlying the Dodd-Frank advice in the memorandum were false. But the court did not address the adequacy of Carey's representation of Hunter Wise; that was not necessary for its ruling. The Florida court did not make findings about what Carey knew during the course of his representation, or what he *could have* investigated or *could have* advised further had he done more investigation.[2] The court simply described a few aspects of his advice and summarized what was stated in his memorandum. Much of plaintiff's theory of malpractice relies on what Carey allegedly neglected to do. The Florida court did not examine the extent of Carey and Winston's duties to Hunter Wise, nor did it address whether any breach of these duties caused damages to the entities. The fact that the court found that Martin and Jager ignored the advice that Carey did provide and knew that some of it was premised on false assumptions does not go far enough to

---

[2]Likewise, the court did not have occasion to explore exactly what Martin and Jager had asked Carey to do—the scope of the representation—or what information they had provided Carey.

preclude plaintiff from attempting to prove her allegations that Carey breached his professional duties and thus proximately caused damage to Hunter Wise.[3]

Defendants have therefore failed to demonstrate that the issue sought to be precluded is the same as that involved in the prior litigation, so their motion to dismiss is denied. Granted, given the Florida court's findings, plaintiff likely faces a steep uphill battle in convincing a factfinder that any acts or omissions of the defendants caused Hunter Wise to suffer damages. But at this stage, plaintiff has stated a minimally plausible claim for legal malpractice (and, in the alternative, breach of contract).

## CONCLUSION

At plaintiff's request, Count II is dismissed with prejudice, and Count III is considered to be pleaded in the alternative to Count I. Defendants' motion to dismiss the complaint [25] is denied. A status hearing is set for March 22, 2016 at 9:30 a.m. The discovery stay is lifted, and the parties are directed to confer and present a discovery plan at the status hearing.

**SO ORDERED.** **ENTERED: March 4, 2016**

**JORGE L. ALONSO**
**United States District Judge**

[3]"Under Illinois law there can be more than one proximate cause of an injury." *Nobles v. White Cnty., Ill.*, 973 F.2d 544, 549 (7th Cir. 1992) (citing *Sears v. Kois Bros. Equip., Inc.*, 443 N.E.2d 214 (Ill. App. Ct. 1982)).